IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville October 15, 2013

## JUSTIN B. CONRAD v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 40501125    John H. Gasaway III, Judge**

_____

**No. M2013-00819-CCA-R3-PC - Filed December 6, 2013**

_____

Justin B. Conrad ("the Petitioner") was convicted of first degree premeditated murder, first degree felony murder, and theft of property of $1,000 or more. The trial court merged the felony murder conviction with the premeditated murder conviction and sentenced the Petitioner to life imprisonment. On direct appeal, this Court affirmed the Petitioner's convictions. See State v. Justin Brian Conrad, No. M2008-01342-CCA-R3-CD, 2009 WL 3103776, at *10 (Tenn. Crim. App. Sept. 29, 2009), perm. app. denied (Tenn. Feb. 22, 2010). The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. The Petitioner now appeals, arguing that he received ineffective assistance of counsel at trial. Upon our thorough review of the record and the applicable law, we affirm the post-conviction court's decision denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

H. Garth Click, Springfield, Tennessee, for the appellant, Justin B. Conrad.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; John W. Carney, District Attorney General; and Art Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

On September 29, 2005, Patrick Summers was found dead in his home on Barton's Creek Road in Montgomery County, Tennessee, from a single gunshot wound to the back of the head. The bullet entered the right side of the back of the head, transecting the high cervical spinal cord and exiting through the left side of the face. The victim was discovered by his best friend, Donald Painter, who went over to the house after being unable to reach Mr. Summers by telephone. Mr. Summers was discovered "sitting there in the chair, leaned over on the floor" in his house. The two men had known each other for about forty years, since attending high school together in Joliette, Illinois. Mr. Painter moved to Tennessee in 1997, and Mr. Summers moved down a few years later. Mr. Painter called 911 to report "a man down." When emergency medical personnel arrived, it was clear that the victim was deceased.

According to friends and neighbors, Mr. Summers was somewhat of a weapons collector who "kept plenty of knives and guns" in his home. Mr. Summers was known to have several sabres, a .22 pistol, a .38 pistol, and a 9mm Rueger. Mr. Summers' neighbor, Peggy Harrell, cleaned house for Mr. Summers. She regularly saw at least five guns scattered throughout the house and remembered seeing two sabre swords on a shelf. Mr. Summers also regularly carried a large roll of money in his front pocket.

Mr. Summers and Mr. Painter had another friend, Tony Conrad, who had moved to Tennessee from Illinois. Mr. Conrad had two sons, Jason and [the Petitioner]. Mr. Painter was aware that one of Mr. Conrad's sons had visited Mr. Summers several times in the year prior to the victim's death.

As the investigation progressed, evidence was collected at the victim's house. Investigator Billy Batson located a box for a laptop computer and several spent shell casings-six from a .38, four from a .22, and six from a 9mm. The spent shell casings were located on the victim's back deck. Investigators also located a bullet hole in the wall near the front door just above the recliner and discovered a bullet lodged in the headboard of a bed on the opposite side of the same wall. When the bullet was removed, Sergeant Brian Prentice of the Montgomery County Sheriff's Department could see directly into the kitchen area where the table was located. The victim was found partially sitting in a chair in the kitchen area.

On September 29, [the Petitioner] called a man named Bobby Brown to ask if he or his father were interested in buying guns. [The Petitioner] met the men at the old Wal-Mart parking lot in Lexington, near [the Petitioner]'s home. Mr. Brown and his father were selling pit-bull puppies. [The

Petitioner] was accompanied by Paul Gilbert Sanders and Nicholas Cruz. Robert Brown, Bobby Brown's father, bought a .22 from [the Petitioner] for $50. The next day, he turned the gun over to the Lexington Police Department. The gun matched the description of one of the guns owned by the victim at the time of his death. [The Petitioner], Mr. Sanders, and Mr. Cruz[] were identified as suspects in the victim's death.

Sergeant Prentice visited the apartment that Mr. Sanders shared with Jeffrey Wood in Lexington, Tennessee. When questioned, Mr. Wood turned over a .357 pistol and a Taurus .38 from the sofa seat cushions. When the apartment was searched, Sergeant Prentice located a 9 mm pistol, two swords and several knives. Subsequently, a search warrant was obtained for [the Petitioner]'s residence. Officers found a shotgun, a laptop computer and charger, binoculars, and night vision goggles when the search warrant was executed. Officers later learned that the laptop was registered to "Patrick" but were unable to confirm the owner's last name or address.

Ralph Lane, a resident of Clarksburg, Tennessee, was a friend of [the Petitioner]'s. The two men had worked together at a gas station in Jackson, Tennessee. In late September of 2005, [the Petitioner] contacted Mr. Lane and asked if he could borrow Mr. Lane's .380 cal. weapon. Mr. Lane agreed, and [the Petitioner] drove to his house to get the gun. Two other men accompanied [the Petitioner]. [The Petitioner] returned the gun the next evening.

According to testimony elicited at trial from Mr. Wood, on the day prior to the murder, [the Petitioner] was at the apartment shared by Mr. Wood and Mr. Sanders. He was accompanied by Mr. Cruz. [The Petitioner], Mr. Cruz, and Mr. Sanders left the apartment to have dinner with [the Petitioner]'s relatives in Clarksville. They returned just prior to midnight and brought several guns and swords into the apartment with them. The men had a .38 special, a .357 Magnum, a shotgun, a .22, a .380, some swords, and some other items. The items were taken into Mr. Wood's bedroom because it was larger. [The Petitioner] informed Mr. Wood that the items came from a man in Clarksville that owed [the Petitioner] money. Mr. Wood drove [the Petitioner] to Clarksburg the next day to deliver a .380 to Mr. Lane. On the way there, [the Petitioner] told Mr. Wood that he had killed the man because he had stolen some money from his family. When [the Petitioner] returned the gun, Mr. Lane asked if it worked "okay." [The Petitioner] responded that "it worked fine." Mr. Lane turned the gun over to a Montgomery County Sheriff's Deputy several days later.

According to Mr. Sanders, he was with [the Petitioner] and Mr. Cruz on September 28, 2005, at his apartment when [the Petitioner] suggested that they go to Clarksville to eat dinner with his aunt. The men left the apartment and stopped at Mr. Lane's house in Clarksburg where [the Petitioner] picked up a pistol. When they got back into the car, Mr. Sanders found out that they were not going to Clarksville to visit [the Petitioner]'s aunt. Instead, Mr. Sanders overheard [the Petitioner] tell Mr. Cruz that they were going to see someone "to get some money back" and that [the Petitioner] was going to shoot the man in the back of the head.

The three men drove to a mobile home off of a two-lane road in a rural area near Clarksville. [The Petitioner] parked to the right of the residence near the air conditioning unit. Mr. Sanders stayed in the back seat of the car while [the Petitioner] and Mr. Cruz went inside. Mr. Sanders "didn't want to be a part of" the activities. While Mr. Sanders sat in the car, he saw [the Petitioner] come out of the house three or four times talking on a cell phone. After about thirty or forty-five minutes, Mr. Cruz and [the Petitioner] came "running out with bags and some other stuff and [the Petitioner] was yelling at [Mr. Sanders] to put a bag in the trunk." [The Petitioner] was also carrying a laptop computer that he threw in the backseat with Mr. Sanders. When [the Petitioner] got into the car, Mr. Sanders heard [the Petitioner] say that the blood came out the victim's head looking like devil horns.

Mr. Sanders confirmed that [the Petitioner] drove the trio back to Mr. Sanders's apartment where they carried everything in and placed it in Mr. Wood's bedroom. Mr. Sanders saw "some knives, a bunch of bullets, and some swords and a pair of night vision goggles" along with two revolvers, an automatic gun, a computer and a .22 pistol. Mr. Sanders saw [the Petitioner] leave the residence with the computer, the .22, the goggles, a shotgun, and a bunch of knives.

Mr. Cruz accompanied the men to the victim's home. According to Mr. Cruz, they stopped at Mr. Lane's house in Clarksburg. Mr. Cruz thought that they were going to Mr. Summer's home. Mr. Cruz had been to the victim's home a few weeks prior to the incident when [the Petitioner] borrowed $200 from Mr. Summers. While they were riding in the car that night, [the Petitioner] told Mr. Cruz that the victim "screwed [the Petitioner's] grandparents over eighty thousand dollars" and that he was going to kill Mr. Summers. When they got to Mr. Summers's house, Mr. Cruz went inside with [the Petitioner]. The men sat around the table and were talking about [the Petitioner]'s family when, according to Mr. Cruz, [the Petitioner] "pulled the

gun and shot Mr. Summers." Mr. Cruz heard the "pop" of the gun and saw Mr. Summers fall over backward in the chair. Mr. Cruz did not hear the victim consent to the removal of the guns, knives, or swords from the house. On the way out the door, [the Petitioner] instructed Mr. Cruz to pick up a bag and take it to the car. [The Petitioner] came out of the house with two bags. When they arrived back in Lexington at the apartment, Mr. Cruz carried a laptop computer and some night vision goggles inside that had been taken from the victim's house. Several guns were "dumped" from the bags onto the floor.

At trial, Special Agent Don Carmen of the Tennessee Bureau of Investigation testified that the bullet found in the headboard of Mr. Summers's bed was fired from the .380 owned by Mr. Lane. The cartridge cases that were found on the back deck of the home matched the weapons found at Mr. Wood's apartment.

[The Petitioner] took the stand in his own defense. At the time of trial he was almost twenty-seven years old and had lived in Lexington his entire life. He admitted that he had a prior conviction for commercial burglary and had served time in the penitentiary when he was eighteen. [The Petitioner] admitted that the men stopped at Mr. Lane's house on the way to the victim's house to get a .380. The three men were going to go target shooting the next morning. [The Petitioner] admitted that he went to see the victim on the day of the incident and was accompanied by Mr. Cruz and Mr. Sanders but denied that he was the shooter. [The Petitioner] had a relationship with the victim and felt like the victim treated him like a grandson.

[The Petitioner] first testified that he heard a gun shot when he was outside the victim's residence by the car. He claimed that, at the time, he was talking to Mr. Sanders. [The Petitioner] then testified that he was on the phone in the driveway when he heard a loud pop, hung up the phone, and ran around the house to see what had happened. He saw Mr. Sanders coming out of the house and Mr. Cruz standing in the living room with a pistol in his hand. At that time, [the Petitioner] grabbed the duffel bag and the .22 pistol off the shelf. [The Petitioner] claimed that the victim had asked him to sell the guns and had discussed an estimate of how much he wanted for each item prior to his death. [The Petitioner] did not stop to check on the victim and admitted that he "messed up" by taking the things, including the guns and a computer from the victim's house.

[The Petitioner] admitted that he had borrowed money from the victim in the past and had told the victim that he was having money problems. Mr.

Summers invited [the Petitioner] back to his house to talk about it. [The Petitioner] denied going to Mr. Summers's house to settle a dispute about $80,000.

On cross-examination, [the Petitioner] admitted that he was a convicted felon that was not supposed to be in possession of a firearm. [The Petitioner] also admitted that the victim did "not give [the .22] to me to sell" but that he thought the computer, worth $1,500, was given to him by the victim. [The Petitioner] also admitted that the victim did not give him the knives that were taken from the residence. [The Petitioner] acknowledged that he sold the stolen .22 pistol to Mr. Brown at Wal-Mart the next day.

[The Petitioner] called Rorey Mullins to testify. Mr. Mullins claimed that he did not remember telling investigators that Mr. Cruz confessed to the murder of the victim while the two were cellmates at the county jail. Mr. Mullins was an evasive witness and refused to answer many of the questions asked by counsel. The trial court allowed the recording of his interview to be played for the jury. Mr. Cruz testified in rebuttal that he had never spoken to Mr. Mullins. Additionally, Mr. Cruz's attorney testified that Mr. Mullins told him that [the Petitioner] had bribed him to give a statement implicating Mr. Cruz in the murder.

State v. Justin Brian Conrad, No. M2008-01342-CCA-R3-CD, 2009 WL 3103776, at *1-4 (Tenn. Crim. App. Sept. 29, 2009), perm. app. denied (Tenn. Feb. 22, 2010).

The Petitioner subsequently filed a petition for post-conviction relief, alleging multiple instances of ineffective assistance of counsel at trial ("trial counsel"). At the post-conviction hearing, trial counsel testified that he had been a licensed attorney for approximately forty years, representing defendants in approximately seventy to eighty criminal trials. Trial counsel could not recall his communications with the Petitioner prior to trial or whether he visited the Petitioner where the Petitioner was incarcerated.

Trial counsel stated that he orally moved to suppress a search warrant on the morning of trial but filed no other pretrial motions. He identified a motion for discovery but could not recall when he filed that motion in relation to the beginning of trial. It was his practice to provide his clients with copies of all discovery in their cases, but he could not recall specifically whether he did so in this case. Trial counsel testified that he never had any trouble receiving discovery from the particular assistant district attorney in this case, so he likely had filed the motion for discovery as a formality. He could not recall whether he communicated with witnesses prior to trial but felt sure that he did so. He also could not

recall when he learned that the Petitioner's co-defendants "were striking deals with the State and would be testifying against" the Petitioner.

Trial counsel recalled two other occasions in which former clients alleged ineffective assistance in post-conviction proceedings but stated that these clients were not successful in their petitions.

On cross-examination, trial counsel confirmed that one of the Petitioner's co-defendants, Sanders, testified at the preliminary hearing, establishing that trial counsel was aware of this witness' testimony well before trial. He did not recall receiving a plea offer of twenty years from the State but stated that, if it had occurred, he would have conveyed such an offer to the Petitioner. Trial counsel agreed that the search warrant he moved to suppress was for items in the Petitioner's house but that many of the items used as evidence in this case were not retrieved from the Petitioner's house.

Trial counsel had no tabulation of the amount of hours he spent on the Petitioner's case except that which he filed in general sessions court because it was his practice not to track his hours for hired, as opposed to indigent, clients, as the Petitioner was in this case. Trial counsel did not recall any surprises in the State's case at trial.

Regarding whether a client should testify at trial, trial counsel stated that his general practice was that he would make a recommendation to the client but that the ultimate decision rested with the client.

The Petitioner testified that he met with trial counsel for the first time on the day of his preliminary hearing. Trial counsel next visited the Petitioner a few months later to give the Petitioner a copy of his indicted charges. Beyond this meeting, the Petitioner did not recall meeting with trial counsel prior to trial. Additionally, the Petitioner did not recall receiving discovery materials or defense trial materials prior to his trial. He believed that he received one or two letters from trial counsel.

According to the Petitioner, trial counsel never discussed with him any plea offers from the State. Additionally, the Petitioner never met with trial counsel to discuss trial preparation. The Petitioner did not see a copy of the search warrant until the morning of trial. The first time the Petitioner saw or was aware of the State's evidence was during the State's case-in-chief at trial.

The Petitioner stated that he testified on his own behalf at trial and that trial counsel had told him that he needed to testify based on the evidence against him. According to the Petitioner, however, trial counsel never prepared the Petitioner for testifying at trial.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and issued a written order denying relief on February 11, 2013. The Petitioner filed his notice of appeal on April 4, 2013, and later moved this Court to accept his late notice of appeal as timely. This Court granted the Petitioner's motion. Accordingly, the Petitioner's appeal is properly before this Court.

## Analysis

Relief pursuant to a post-conviction proceeding is available only when the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006); see also Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

The Petitioner argues that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[1] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

---

[1] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such

a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

*Trial Counsel's Investigation of the Case*

The Petitioner asserts that trial counsel was ineffective in his investigation of the Petitioner's case. Specifically, the Petitioner argues that, when the State announced on the day of trial that the Petitioner's co-defendant, Cruz, would be entering into a plea agreement in exchange for his testimony against the Petitioner, trial counsel should have requested a continuance of the trial in order to fully investigate the potential testimony of Cruz.

The post-conviction court stated in its order denying relief, "The jury . . . knew that Cruz and Sanders' testimony resulted from favorable treatment by the State, and [trial counsel] illustrated just how favorable Mr. Cruz' deal was by eliciting testimony that Mr. Cruz would be eligible for release less than three years from the trial date." Regarding trial counsel's decision not to question Cruz regarding his criminal history on cross-examination, the post-conviction court found that it was a tactical decision that should not be reexamined at post-conviction. Moreover, the post-conviction court found that the Petitioner had failed to present at the post-conviction hearing any evidence pertaining to Cruz of which trial counsel was unaware.

The record does not preponderate against the post-conviction court's findings. We agree with the post-conviction court that the Petitioner did not provide any evidence at the post-conviction hearing to establish that trial counsel was unaware of the substance of Cruz's trial testimony prior to trial. Trial counsel confirmed that the other co-defendant, Sanders, testified against the Petitioner at the preliminary hearing, establishing that trial counsel was aware of this witness' testimony prior to trial.

Furthermore, the Petitioner failed to establish a reasonable probability that the result of the trial would have been different if trial counsel had requested a continuance. See Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). The Petitioner claims that trial counsel's alleged deficiency in this regard "significantly affected the outcome of the jury trial." We note, however, that requesting a continuance would not have prevented Cruz's testimony but rather would have given trial counsel more time to investigate ways to discredit Cruz's testimony. Nevertheless, we agree with the post-conviction court that trial counsel

adequately highlighted for the jury Cruz's deal with the State to elicit his testimony.[2]  We also agree that trial counsel made a tactical decision not to ask Cruz about his criminal history.  At trial, the following colloquy occurred in a jury-out hearing:[3]

> State: One other thing, as long as we are here, Judge.  I have obviously gone the extra mile on Mr. Cruz's record, it reflects that he was arrested in Henry County in the NCIC for aggravated burglary and it reflects that that entry was later nolled.  For the record, I am going to ask that [trial counsel] not be allowed to ask him about that on the grounds of relevancy[.]
>
> Trial Counsel: That wasn't an expungement?
>
> State: I don't think that it was expunged[.] It is showing up in the database and they are not suppose[d] to show up if they are expunged[.] And he has some misdemeanors.
>
> . . . .
>
> The Court: Well I think Rule 608(b) addresses this situation[.] It is when you want to attack someone's credibility by asking them about a particular incident of conduct other than convictions.  In other words, you can ask somebody about conduct that didn't result in a conviction, if it goes to truthfulness and you comply with Rule 608 procedure here.
>
> State: So you are ruling that he can say isn't it true that you burglarized a house in Henry County –
>
> Trial Counsel: No, all that I would ask –
>
> State: He's bound by the answer.

---

[2] We glean this information from the recitation of the trial transcript in the post-conviction court's order denying post-conviction relief.

[3] We once again glean this information from the recitation of the trial transcript in the post-conviction court's order.  Although a portion of the trial transcript was included in the record on appeal, this portion of the transcript was not included.

The Court: I think he can ask it and I think he is bound by the answer.

. . . .

The Court: But if he says no, you can't prove it by extrinsic evidence.

Thus, we agree with the post-conviction court that trial counsel's decision not to question Cruz about this conduct was a tactical decision, given that trial counsel could not present extrinsic evidence of Cruz's criminal history. Therefore, the Petitioner has failed to establish a reasonable probability that, had trial counsel requested a continuance, the result of the trial would have been different. See Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). Accordingly, the Petitioner has failed to establish ineffective assistance of counsel in this regard, and he is entitled to no relief on this issue.

*Cumulative Errors of Trial Counsel*

The Petitioner also argues that trial counsel was ineffective in several other ways, the sum total of which denied the Petitioner of a fair trial. The errors cited by the Petitioner, without further argument or authority, are as follows:

> Trial counsel did not file a discovery motion until one week leading up to trial that shows a lack of preparedness. Trial counsel orally moved for suppression of evidence on the morning of trial. Trial counsel made arguments without having fully researched the matters and properly briefed the court. Trial counsel was not sufficiently prepared for the State's inclusion of the codefendant Mr. Cruz as a witness wherein counsel did not indicate any information as to what Mr. Cruz's testimony would be at trial.

We will address each of these alleged errors in turn.

Turning to the Petitioner's first contention that trial counsel was ineffective in failing to file a discovery motion until one week before trial, the post-conviction court, in its order denying relief, stated that the Petitioner failed to identify at the post-conviction hearing any evidence that he did not receive and how the absence of such information prejudiced him. The record does not preponderate against the post-conviction court's findings. Trial counsel testified at the post-conviction hearing that he never had had trouble receiving discovery from the particular assistant district attorney in this case, so he likely had filed the motion for discovery as a formality. We agree with the post-conviction court that the Petitioner has failed to establish deficient performance and, thus, did not receive ineffective assistance as to this issue.

-12-

The Petitioner's next assertion is that trial counsel was ineffective in orally moving to suppress evidence on the morning of trial. In denying relief, the post-conviction court noted that the Petitioner's argument in this regard is essentially that the trial court improperly denied the suppression motion. Thus, the post-conviction court stated that it could not reevaluate the validity of the suppression motion. Furthermore, the court stated that, to the extent trial counsel should have filed the suppression motion before trial, the decision made by the trial court would not have changed, based on controlling case law. Accordingly, the post-conviction court determined that the Petitioner failed to establish prejudice as to this issue.

The record does not preponderate against the post-conviction court's findings. The suppression motion pertained to the evidence obtained as a result of the warrant to search the Petitioner's house. Trial counsel agreed at the post-conviction hearing that, although the search warrant was for items in the Petitioner's house, much of the State's evidence in the case was retrieved from sources other than the Petitioner's house. Therefore, the Petitioner has failed to establish that, even if trial counsel were deficient, he suffered prejudice. Thus, we need not address the deficiency prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this issue.

The Petitioner's next alleged error is that "[t]rial counsel made arguments without having fully researched the matters and properly briefed the court." However, he makes no further explanation as to which arguments he is referring or how he was prejudiced. Accordingly, the Petitioner has failed to establish his claim of ineffective assistance in this regard. Moreover, the Petitioner's final alleged error is the claim that he makes within his first argument regarding the co-defendant's decision to testify. We already have determined that trial counsel's representation was not ineffective as to this issue.

"Our Court has previously noted that a Petitioner who has failed to show that the received constitutionally defective representation on any single issue may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors." Tracy F. Leonard v. State, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *21 (Tenn. Crim. App. July 5, 2007), perm. app. denied (Tenn. Sept. 13, 2007) (citing Leon J. Robins v. State, No. M2005-01204-CCA-R3-PC, 2006 WL 1816361, at *20 (Tenn. Crim. App. June 27, 2006), perm. app. denied (Tenn. Oct. 30, 2006)) (other citations omitted). Here, the Petitioner has failed to establish any one error of trial counsel that was constitutionally defective. Accordingly, his claim for relief under the cumulative error doctrine lacks merit, and he is entitled to no relief on this issue.

## CONCLUSION

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE